Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra I. Grassgreen (CA Bar No. 169978)
John W. Lucas (CA Bar No. 271038)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415.263.7000
Facsimile: 415.263.7010
Email: jpomerantz@pszjlaw.com
        dgrassgreen@pszjlaw.com
        jlucas@pszjlaw.com

Proposed Attorneys for Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| In re: | Case No.: 16-43112-CN |
| Tri-Valley Learning Corporation,[1] | Chapter 11 |
| Debtor. | **DECLARATION OF LYNN LYSKO IN SUPPORT OF FIRST DAY MOTIONS** |

I, Lynn Lysko, hereby declare as follows:

I am the Chief Executive Officer of Tri-Valley Learning Corporation ("**TVLC**" or "**Debtor**"), a California Non-Profit Corporation organized under the laws of the State of California, and the above-captioned debtor and debtor in possession in this voluntary chapter 11 case (the "**Chapter 11 Case**") filed on the date hereof under title 11 of the United States Code (the "**Bankruptcy Code**"). On March 31, 2016, I was asked to take over as Interim CEO of the Debtor and served in that capacity until my appointment as permanent CEO and president on October 27, 2016.

I hold a doctorate in educational administration with a focus on Teaching and Learning from Walden University. In 2012, I received the Frank Dilley Outstanding Doctoral Study award for my work on English learners. I have a Master of Arts is in Spanish from the University of Western Ontario, a Bachelor of Education from the University of Toronto, and a Bachelor of Arts (double major in French and Spanish) from Wilfrid Laurier University in Ontario, Canada. I have twenty-

---

[1] The last four digits of the Debtor's tax identification number is (4585). The location of the Debtor's service address is 3252 Constitution Drive, Livermore, CA 94551.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

nine years' experience in education that have been primarily at the secondary level, teaching for fifteen years, and currently leading into my fifteenth year as an administrator. I have held positions that span TK-12 as a vice principal, high school principal, district office curriculum director, county office of education consultant, and assistant superintendent. Additionally, I have served as Adjunct Faculty at CSU Stanislaus and Brandman University. My focused disciplines include school and district improvement, and creating innovative programs such as the award-winning Language Institute in Modesto City Schools and a concentration on students who are at-risk and/or English learners and a belief that all students deserve the choice of college and career upon high school graduation. I also held leadership roles in Delta Kappa Gamma, Stanislaus County Commission for Women, and the Association for California School Administrators. In 2012, I was named a Stanislaus County Commission Woman of the Year.

Except as otherwise indicated all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's 'operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management and the Debtor's advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtor. If called upon as a witness, I could and would testify competently to the facts and matters expressed in this Declaration.

This Declaration is divided into two parts: The first part contains general background information regarding the Debtors' business operations and financial condition; the second part contains information relevant to the various motions for relief filed on or about the Petition Date (collectively, the "First Day Motions").

## I.

## OVERVIEW

### A.    General Background

The Debtor is a 501(c)(3) non-profit corporation that owns, manages and operates four charter schools. Two of the schools and the Debtor's corporate headquarters, are located in Alameda

2

County in the City of Livermore, California. The other two schools are located in Stockton, California.

The two schools located in Livermore consist of an elementary school (K-8) located at 3252 Constitution Drive and a high school located at 3090 Independence Drive. The two schools located in Stockton consist of a middle school (Grades 6-8), located at 1605 E. March Lane and an elementary school located at 1016 East Bianchi Drive in Stockton (K-5). The Debtor's schools operate on a traditional calendar (August-June) and all four schools are in the middle of the first semester.

**B.      Overview of Charter Schools and Debtor**

Charter schools are tuition-free public schools of choice. They have no district boundaries and anyone who wishes to attend the charter school may apply. Charter schools are accountable to produce positive academic results and adhere to the charter contract. The basic concept of charter schools is that they exercise increased autonomy in return for this accountability. They are accountable for both academic results and fiscal practices to several groups, including the sponsor that grants them, the parents who choose them, and the public that funds them.

The Debtor uses education innovation research to design, create and operate world-class, exemplary charter schools that encourage and enable every student to reach his or her full potential as a scholar, a citizen and a life-long learner. The Debtor's schools prepare all students for success in premiere universities and the global workforce. The Debtor is a leader in education innovation, and their schools are used as a showcase for best educational practices. In collaboration with parents, community members, businesses, and educators, the Debtor continuously evaluates, innovates, and implements improvements to their programs. The Debtor is in its sixth academic year providing all families seeking high quality education in the Tri-Valley region and East Bay, a sought-after alternative to low-performing schools in their local districts.

The Livermore Valley Charter School was founded in 2004 by a collaborative group of parents and educators in response to the Livermore school district's decision to close two magnet schools due to budget cuts. Together, parents and educators endeavored to create a school that embraced proven and innovative teaching techniques to best prepare children for the 21st century.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

3

DOCS_SF:92389.1 28499/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Their charter petition drew praise from California charter school advocates and has been used as a model for other charter schools statewide. The impetus for creating the Livermore Valley Charter School was choice for children, as is reflected on the school's website (www.lvcs.org) and in the name of the school's foundation, Choice for Children Education Foundation (CCEF). The students at the Debtor get an education that encompasses more than just the core curriculum; it focuses on the skills that make children into competent citizens and life-long learners. Their education includes small class sizes, enrichment in the areas of art, music, physical education, science, and foreign language, and a curriculum driven by the most current research in education.

The Debtor began operation in 2005, and has the highest performing K-5 and grade 6-8 programs in the Livermore area. The extraordinary parent and staff commitment to volunteerism and financial support for the benefit of the schools has continued and strengthened since opening day at the Livermore Valley Charter School. This same unwavering support for choice in education, led to the Livermore Valley Charter School community to begin discussing the possibility of a charter high school in May 2006. They wanted to provide students attending the Livermore Valley Charter School, with an opportunity to remain in the same educational system. The High School opened its doors in August 2010.

The Livermore Valley Charter Preparatory High School's philosophy of education is a natural progression from that of the Livermore Valley Charter School. The High School provides a college preparatory education in an individualized, creative, collaborative, experiential and emotionally supportive environment that challenges every student to reach his or her potential. LVCP offers free tutoring and provides laptops to all students. Class sizes are 22 to 25 students, and can never exceed a student/teacher ratio of 27:1, according to the High School's charter.

The Acacia Charter Schools opened in August of 2013 with 32 middle school students and 135 students in grades TK-5. In their fourth year of operation, AECS serves 330 students and AMCS serves 145 students in grades 6-8.

DOCS_SF:92389.1 28499/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## C. **Capital and Debt Structure**

### (1) Secured Debt of Heritage Bank

The Debtor is indebted to Heritage Bank of Commerce ("**Heritage**") one a promissory note, dated October 1, 2015 (the "**Heritage Prepetition Loans**"). Specifically, the Debtor has a commercial term loan in the original principal amount of $675,000 with Heritage Bank (the "**Heritage Term Loan**"). The Heritage Term loan bears interest at Prime rate plus 1.5 percentage points and has a maturity date of October 1, 2019. The current balance due under the Heritage Term Loan is approximately $515,000. The Debtor also had a commercial line of credit that matured on September 30, 2016 in the original principal amount of $800,000 (the "**Heritage Line of Credit**"). The current balance on the Heritage Line of Credit is $800,000. Pursuant to a Commercial Security Agreement dated October 1, 2015 (the "**Heritage Security Agreement**"), the obligations under the Heritage Term Loan and the Heritage Line of Credit are secured by all inventory, chattel paper, accounts, equipment, general intangible and deposit accounts, and the proceeds thereof (the "Heritage Prepetition Liens"). Heritage Bank perfected its security interest by filing a UCC-1 Financing Statement and certain amendments thereto. Collectively, the financing and security agreements related to the Heritage Term Loan and the Heritage Line of Credit are referred to as the "**Heritage Prepetition Loan Documents**."

### (2) Secured Debt of 2012 Bonds

As of October 4, 2012, the California School Finance Authority, a public instrumentality of the State of California (the "**Authority**") issued its California School Finance Authority Educational Facilities Revenue Bonds (Tri-Valley Learning Corporation Project), Series 2012A (Tax-Exempt Bonds) (the "**2012 Bonds**"), in the original aggregate principal amount of $27,500,000, pursuant to an Indenture, dated as of October 1, 2012 (the "**Indenture**"), by and between the Authority and UMB Bank, National Association, as successor trustee (the "**Bond Trustee**"). The 2012 Bonds were issued to finance the acquisition, construction, improvement and equipping of certain public charter school facilities, located in the City of Livermore, capable of accommodating approximately students in grades K-8, to be used and operated by the Debtor as a charter school, and the rent payable by the Authority under the Site Lease.

5

In addition, the Bond Trustee caused $1,324,147.82 to be advanced to the Debtor to cover pre-petition emergency payroll funding (collectively, the "**Emergency Payroll Fundings**"). Subject to the terms of a letter executed by the Debtor and dated August 30, 2016, the amount of $1,000,000 was advanced on or about that date, to be repaid no later than a first payment of $500,000 by February 1, 2017, and the remaining $500,000 by June 1, 2017. Subject to the terms of a letter executed by the Debtor and dated September 29, 2016, and email from the Debtor the next day reducing the amount to be advanced, the amount of $324,147.82 was advanced on September 30, 2016, to be repaid no later than October 15, 2016 (no repayment was made). Each of the Emergency Payroll Fundings is secured by the collateral that ultimately secures the 2012 Bonds, and is subject to the terms of the respective letter executed by the Debtor.

The 2012 Bonds and the Emergency Payroll Fundings are secured by, among other things, a "Leasehold Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing," made by the Debtor for the benefit of the Bond Trustee, and a "Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing," also made by the Debtor for the benefit of the Bond Trustee (the "**2012 Bonds Prepetition Liens**," and together with the Heritage Prepetition Liens, the "**Prepetition Liens**"). Moreover, the Site Lease and Sublease of the real property are assigned by the Authority to the Bond Trustee. A UCC 1 Financing Statement was filed on September 23, 2016, by counsel to the Debtor (Procopio), pursuant to the Debtor's obligations under the documents related to the 2012 Bonds, with UMB Bank, National Association, as secured party.

Pursuant to the California Education Code, the Debtor elected to provide for certain payments on its obligations with respect to the 2012 Bonds and under the documents related to the issuance of the 2012 Bonds, with such election instructing the Controller to make an apportionment to the Bond Trustee in amounts and on dates sufficient to repay the 2012 Bonds and pay necessary and incidental costs (the "**Intercept Notice**").[2] The California Education Code further provides that the Debtor and its creditors do not have a claim to funds apportioned or anticipated to be apportioned

---

[2] During the Interim Period, the Debtor is not seeking authority to use any funds that would otherwise be paid to the Bond Trustee pursuant to the Intercept Notice. Moreover, nothing in this Motion or the Interim Order shall impact any parties' rights regarding funds payable pursuant to the Intercept Notice.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

by the Controller. The Indenture excludes payments derived from the Intercept Notice from any pledge or assignment made under the Indenture.

(3) **Other Debt.**

The Debtor also owes approximately $1.7 million to unsecured creditors on account of past due trade debt.

## D. **Events Leading to Chapter 11 Filings**

The Debtor's obligations under its note and line of credit with Heritage Bank of Commerce (the "**Bank**") are currently past due. The Bank is owed in excess of $1.3 million consisting of a term note in the principal sum of $650,000 having a current balance of approximately $515,000 and a line of credit in the principal amount of $800,000, all of which became all due on September 30, 2016.

The Debtor's operation have also been burdened by legal bills for services relating to the defense of the Debtor's charters issued by the New Jerusalem School District near Stockton as well as for processing and preparing accreditation and charter renewal petitions.

The Debtor also incurred various expenses and other costs arising from the opening of an "overflow" elementary school in Livermore very close to the Livermore Elementary School, which has had an effect upon enrollment and has caused the reduction of fourteen members of the teaching staff at the Livermore Elementary School.

Most recently, on November 1, 2016 service of a levy on the Debtor's bank accounts by representatives of Wells Fargo Bank has also contributed to the Debtor's struggles, which hindered the Debtor's ability to pay other pending obligations. Also, the need to restructure was also increased by the Debtor's outside financial management that caused inconsistencies and other issues with cash flow.

In the end, the Debtor's primary purpose in filing its chapter 11 case is to allow for short term stability for the purpose of permitting the Debtor to preserve the long term viability of its very successful educational and instructional mission for each of the members of the Charter School community, students, and staff.

To ensure that the Debtor's operations continue so that it can protect student populations and preserve the long term viability of the four operating schools, specific steps have been taken to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

accomplish positive cash operations, stave off litigation and related costs and risks and helping put the Debtor on a path to providing continued excellence in the long term educational growth of its most treasured asset, its students. Among those steps are recently implemented changes that are designed to achieve operational and financial stability while preserving educational excellence.

Initially, on October 27, 2016, the Debtor retained Charter Impact to replace TVLC's former financial management operator. I believe this will stabilize the accuracy and timeliness of financial reporting and cash management.

In the last week of October and first week of November, the Debtor has begun to significantly reduce operating expenses by accepting the voluntary resignations tendered by fourteen teachers at the Livermore Elementary School (most of whom were the higher paid teachers) while still being able to maintain educational quality and the effective instruction of all students at the school. Teacher to pupil ratios had previously been significantly out of line with industry standards. The loss of fourteen teachers, along with the departure of approximately 120 students will stabilize student to teacher ratios at more financially rational levels given industry standards.

Additionally, the Debtor and its advisors have engaged in negotiations with its Bank and the holders of bonds issued in 2012 (which financed the construction and repurposing of the facility in Livermore used by the Elementary School). The Debtor believes that these negotiations will help form the basis of restructuring their financial commitments so they are in-line with the cash flow from operations and any other public funding.

## II.

## FIRST DAY MOTIONS

To enable the Debtor to minimize the adverse effects of the commencement of its bankruptcy case, the Debtor has requested various types of relief in the motions filed concurrently with this Declaration (each, a "**First Day Motion**" and collectively, the "**First Day Motions**"). Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the relevant First Day Motion listed below.

I have reviewed each of these First Day Motions (including the exhibits and schedules thereto), and I incorporate by reference the factual statements set forth in the First Day Motions. The

DOCS_SF:92389.1 28499/001
Case: 16-43112   Doc# 2   Filed: 11/08/16   Entered: 11/08/16 17:31:13   Page 8 of 24

facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions is: (a) necessary to enable the Debtors to operate under chapter 11 with minimal disruption to its current business operations; and (b) essential to maximizing the value of the Debtors' assets for the benefit of its estates and creditors.

It is my further belief that, with respect to those First Day Motions requesting the authority to pay prepetition claims or to continue selected prepetition programs (e.g., those First Day Motions seeking relief related to the Debtors' obligations to their employees, customers, vendors, and certain taxing authorities), the relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases and avoid immediate and irreparable harm to the Debtors and their estates.

I believe that any diminution in the relief requested in the First Day Motions could have an immediate and irreparably harmful impact upon the going concern value of the estates, to the detriment of all of the Debtors' stakeholder constituencies. I believe that payment of the prepetition claims identified in the First Day Motions will forestall such irreparable harm and that all the Debtors' creditors will ultimately benefit from the relief requested therein.

## A. **Responsible Individual Application**

By the Responsible Individual Application, the Debtor seeks to approve my appointment as the designated individual with primary responsibility for the duties and obligations of the Debtor during its chapter 11 case.

My contact information is:

Lynn Lysko, Ed. D.
CEO
Tri Valley Learning Corporation
3252 Constitution Dr.
Livermore, CA 95441

## B. **Motion for Use of Cash Collateral**

The Debtor requests authority to use the Lenders' cash collateral on an interim basis until the Court can schedule a final hearing on the Motion in accordance with terms set forth in the proposed Interim Order attached to the Cash Collateral Motion as **Exhibit "1."** In addition, the Debtor requests authority to use cash collateral on a final basis through June of 2017 pursuant to the terms

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

of a proposed form of final order (as described herein) and budget that will be filed with the Court within fourteen (14) days of entry of the Interim Order.

The Debtor has formulated a budget of operations that I have reviewed through and including December 2, 2016 (the "**Budget**"), which is attached to the Cash Collateral Motion as **Exhibit "2"**. The Budget sets forth the normal and customary operating expenses, including payments to employees and vendors that must be paid to sustain operations of the Debtor's schools and provide a meaningful educational experience to the students while the Debtor undergoes its operational and financial restructuring. Absent payment of the expenses set forth in the Budget, I believe the Debtor would cease operating, to the detriment of the students, creditors and other parties in interest.

The Debtor requires immediate use of cash collateral to sustain operations. Without use of cash collateral, the Debtor will not be able to pay normal and customary operating expenses including payroll obligations, tax obligations and other essential providers of goods and services and be forced to cease operations, putting hundreds of students at risk. Cessation of operations will eliminate the Debtor's going concern value, destroy any hope at a successful reorganization and undermine the strong policy in favor of reorganization embodied by the Bankruptcy Code. The potential loss of the Debtor's business constitutes irreparable harm justifying use of cash collateral.

I am optimistic that Heritage Bank and the Bond Trustee will consent to entry of the Interim Order as it provides reasonable protections and fairly balances the interests of the Debtor and their interests. However, even if Heritage Bank and the Bond Trustee do not consent, their interests are adequately protected for the following three reasons.

First, the Debtor's assets are worth more as a going concern. The only source of recovery for creditors is through funding received from governmental entities on account of services provided to students. If the Debtor does not continue to operate, that source of funding will immediately cease and there will be no recovery to creditors in this case.

Second, as reflected in the Budget, the Debtor is projected to be essentially breakeven on a cash flow basis during the term of the Budget and its cash balance is projected to increase following the Petition Date. Hence, there will be no diminution in the value of any Cash Collateral.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Third, notwithstanding that the Lenders are adequately protected for the reasons noted above, the Debtor has proposed further adequate protection in the form of replacement liens, superpriority claims and other general provisions as set forth in more detail in the Interim Order. Specifically, and as set forth in the Interim Order, the Debtor proposes to grant the Lenders, effective immediately and without the necessity of the execution by the Debtor of any financing statements or other documentation, in accordance with section 361(2) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable replacement lien on its existing collateral and the proceeds thereof ("**Postpetition Collateral**"), but only if and to the extent that (i) the Lenders' prepetition security interests are valid, enforceable, properly perfected, and unavoidable and (ii) the Debtor's use of Cash Collateral results in a diminution of value of the Lenders' collateral. Any replacement lien would exclude causes of action arising under sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and 553 of the Bankruptcy Code. The proposed replacement liens shall be subject only to valid, perfected, enforceable and unavoidable liens and security interest granted by the Debtor to any person or entity which were superior in priority to prepetition security interests and liens held by the respective Lenders and only to the extent such prepetition senior liens are not otherwise subject to avoidance or subordination.

## C.    **Cash Management Motion**

Pursuant to the Cash Management Motion, the Debtor seeks authorization for the continued use of the Debtor's existing bank accounts and cash management system on the grounds that such use is necessary for the Debtor's continued operations. Specifically, the Debtor seeks an order: (a) authorizing continued use of the Cash Management System (defined below); (b) authorizing the Debtors to maintain their prepetition bank accounts (collectively, the "Bank Accounts") identified on Exhibit "A" annexed to the Cash Management Motion; (c) authorizing the Debtors to continue using their existing business forms and checks; and (d) to the extent applicable, waiving of any stay. The Debtors request expedited relief as immediate relief is necessary to avoid immediate and irreparable harm to the estates. A proposed form of order is annexed to the Cash Management Motion as Exhibit "B".

DOCS_SF:92339.2 84977/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In the ordinary course of business, the Debtor maintains a cash management system that provides well-established processes for the collection, concentration, management, disbursement, and investment of funds generated and used in their operations (the "**Cash Management System**"). The Cash Management System is a centralized process specifically designed to accommodate the Debtor's business operations.

The Cash Management System consists of: checking accounts at both Heritage Bank of Commerce and also Bank of the West. I am advised both bank are depositories on the United States Trustee Region 17 List of Authorized Depositories. However, the Debtor believes that it will continue to use the Heritage Bank Accounts as the primary debtor in possession accounts.

In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor incurs routine bank charges and fees relating to the administration of the Cash Management System. While it is difficult to readily determine the aggregate amount of unpaid prepetition banking fees as of the Petition Date (given, for example, the bank's varying timing of charging/deducting such fees from a given account), on average, the Debtor pays approximately $1,000 in monthly banking fees and charges associated with the Bank Accounts.

I understand that the United States Trustee has established certain operating guidelines for debtors in possession. One such provision requires a chapter 11 debtor in possession to close all existing bank accounts and open new bank accounts. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, helps protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

Through the Cash Management Motion, the Debtor seeks a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened. If strictly enforced in this chapter 11 case, I believe that the requirement to close and open new accounts would cause a disruption in the Debtor's activities and would impair the Debtor's ability to operate.

I believe that the maintenance of the Bank Accounts and the Cash Management Systems will greatly facilitate the Debtor's operations during the pendency of this chapter 11 case. The continued

DOCS_SF:93192.2 84977/001

maintenance of the Debtor's Bank Accounts is of paramount importance because the accounts are used to effectuate payments to their employees and vendors.

If the Bank Accounts were closed, the Debtor would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments out of the Debtor's accounts, which would disrupt the flow of postpetition disbursements. In addition, closing the Bank Accounts would require the Debtor to cancel and reinstitute wire transfer instructions, which would be difficult to modify under exigent circumstances. I believe that these disruptions would severely impact and could irreparably harm the Debtor's ability to operate its business at this critical juncture while they transition to their status debtors in possession. To avoid these disruptions and delays in the operation of the Debtor's business, I believe the Debtor should be permitted to maintain their existing Bank Accounts and, if necessary, to open new accounts as debtor in possession accounts or to close any unneeded existing accounts.

To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtors will promptly notify Heritage and Bank of the West not to honor checks drawn on the Debtor's accounts before the Petition Date, except upon limited Court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

If the relief requested herein is granted, the Debtor will not pay, and both banks will be required not to pay, any debts incurred before the Petition Date, other than as specifically authorized through this Motion or otherwise ordered by the Court.

I believe that the Bank Accounts and the Cash Management System are well-suited to the Debtor's business needs and operations. To require the Debtor to close the Bank Accounts and establish new accounts would require considerable time and expense to the Debtor's estate. Similarly, continued use of the Operating Account is vital to the Debtor's operations. Permitting the Debtor to continue using its existing Bank Accounts is essential to a smooth and orderly transition of the Debtor into chapter 11 and to avoid disruption of their business and operations.

13

DOCS_SF:92319.2 84997/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Debtor respectfully submits that, under the circumstances, the maintenance of the Cash Management System and Bank Accounts in substantially the same form as it existed prior to the Petition Date (or as the Debtors may modify the system in the ordinary course of business) is in the best interests of the Debtor's estate and creditors.

As part of the relief requested, the Debtor also seeks a waiver of the requirement by the United States Trustee for Region 17 to establish specific bank accounts for tax payments. See Region 17 United States Trustee Guidelines, § 4.4.6. I believe that the Debtor's tax obligations can be paid most efficiently out of the existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the Bank Accounts through the Debtor's required monthly operating reports, and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

The Debtor hereby requests authority to maintain the Bank Accounts and utilize them pursuant to the existing Cash Management System described above. I do not believe that allowing the Debtor to do so will prejudice their estates or any party-in-interest. If the relief requested herein is granted, the Debtors will not pay any debts incurred before the Petition Date unless specifically authorized by this Court pursuant to a separate motion.

To minimize confusion, the Debtor intends to provide Heritage and Bank of the West with a list of outstanding prepetition checks identifying the Prepetition Claims Checks within three (3) business days of the entry of any order authorizing such Prepetition Claims Checks so that it is clear which checks may be paid.

**D.**    **Wage and Benefit Motion**

        (1)     The Debtor's Workforce

The Debtor has a current workforce of approximately 176 Employees between the corporate location and the Charter Schools. Approximately 90 of those Employees are employed on a salaried basis. The remainder of the workforce is employed on an hourly basis. The Debtor's workforce includes: employees who work at the Debtor's corporate center, teachers, pupil support staff, certificated supervisors and administrators, classified supervisors and administrators, instructional aides, maintenance and food staff, clerical staff, technical staff, and office staff. The Debtor also

14

DOCS_SF:92319.2 84997/001

employs three key managerial personnel, Lynn Lysko, the Debtor's CEO, Cheryl Weaver, the Debtor's Director of Compensation and Human Resources, and Julie Lassig, the Debtor's Director of Development (the "**Managerial Personnel**").

(2)     <u>Prepetition Compensation</u>

**<u>Salaries and Wages</u>.** Generally, in the ordinary course of business, the Debtor issues payroll to all Employees on a semi-monthly basis, with payroll being disbursed on the fifteenth and last day of each month. The next payroll date is November 15, 2016, which covers the period from October 25, 2016 through November 8, 2016. The following payroll date is November 30, 2016, which covers the period November 9, 2016 through and including November 23, 2016. The Debtor pays, on average, approximately $370,000 in gross wages and salary per month.

The Debtor's payroll is distributed either by direct deposit into the Employees' personal bank accounts or by checks issued from a payroll account maintained by the Debtor. The Debtor estimates as of the Petition Date, it owes approximately $185,000 on account of wages, salaries, and compensation, the Prepetition Wages, for the most recent pay period as described above. No employee is owed more than $12,850 on account of Prepetition Wages.

Due to cash flow issues, the Debtor's teachers have been paid on a 2015-2016 salary schedule. However, the Debtor will be implementing a change in teachers' salary so that they are on the 2016-2017 schedule contemporaneous with the filing of this case. In addition, to address and stem any teacher departures, the Debtor plans to file a motion authorizing the payment of retention payments, with such payments being equal to the difference between what the teachers have been paid on the prior year's schedule and the schedule for this academic year.

**<u>Employment Taxes and Fees</u>.** In the ordinary course of business, the Debtor takes certain employee deductions (as applicable) from their Employees' pay, including, *inter alia*: (a) employer payroll taxes and the employee portion of FICA and unemployment taxes (comprising most of the employee deductions); (b) Employee contributions to health and disability related benefits (discussed further below); (c) contributions to employee benefit plans; and (d) legally ordered deductions such as wage garnishments, child support and tax levies. The Debtor forwards amounts equal to the applicable employee deductions (which prepetition typically totaled approximately

15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

$61,000 per bi-monthly pay period) to the appropriate third-party recipients, including taxing authorities. The Debtor seeks authorization, pursuant to sections 507(a)(5) and (8) of the Bankruptcy Code, to pay the employee deductions to the appropriate parties, including, but not limited to, all priority payroll taxes associated with any Prepetition Wages.

**PTO.** Employees that are teachers earn approximately 3.33 hours of paid time off each pay period and corporate staff earns 6 hours of paid time off for each pay period; however, after having been employed five years, the corporate staff earns paid time off of 7.66 hours per pay period. Employees' PTO carries over from year to year. In accordance with California law, the Debtor "cashes out" eligible employees for their accrued PTO when an employee separates employment. As of the Petition Date, Employees have accrued PTO (the "**PTO Obligations**"). The Debtor requests authority to honor PTO in the ordinary course. In addition, in the event of a postpetition termination of Employees, the Employees will be paid for all unused PTO, plus PTO that accrued prior to the Petition Date up to the amount of the priority limit under Bankruptcy Code section 507(a)(4), $12,850 (inclusive of any amounts that were already paid subject to the same limitation).

**Business Expenses.** The Debtor customarily reimburses their Employees for business expenses incurred in performing their duties such as travel, meals, mileage, and telephone use. Because of the varying timing of submissions of expense reports by Employees, it is difficult for the Debtor to accurately estimate how much in prepetition Employee expenses may have accrued. Historically, the Employee expenses average approximately $3,000 per month. If the Debtor is not granted authority to do so, the individual Employees will bear the burden of paying the Debtor's expenses from their personal funds. This would be patently unjust to the Employees and would only serve to lower Employee morale at a time when the Employees' best efforts are crucial to the Debtor and its estate. The Debtor seeks authority, but not direction, to pay any prepetition Employee expenses and to continue to pay them postpetition in the ordinary course of business to Employees to the extent any such claims are posted after the Petition Date.

**Medical, Dental and Vision**. The Debtor offers eligible employees medical, dental, and vision benefits. The medical benefits are through California Choice and the Dental, Vision, and Life through Guardian ("**Health Insurance Plans**").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Debtor pays on average approximately $60,000 - $75,000 per month in premiums associated with the medical Health Insurance Plans, which varies per billing cycle. As of the Petition Date, the Debtor owes approximately $75,000 on account of its prepetition obligations under the Health Insurance Plans. The Debtor seeks authority, but not direction, to pay any prepetition claims under the Health Insurance Plans and to continue to pay them postpetition in the ordinary course of business to the extent any such claims are posted after the Petition Date.

**Retirement Benefits Plan**. The Debtor offers eligible Employees the opportunity to participate in a 401(k) Savings and Retirement Plan (**"401(k) Plan"**). The Debtor seeks authority to continue to maintain their 401(k) Plan and remit withholdings in the ordinary course of business. As of the Petition Date, the Debtor estimates there are approximately $1,000 in 401(k) Plan contributions that must be made relating to the prepetition period and are seeking authority, but not direction, to remit such payments to the plan administrator.

**California State Teachers' Retirement Systems**. The Debtor participates in the California State Teachers' Retirement Systems ("**STRS**") for eligible employees, and offers a 403(b) to its employees. The Debtor pays approximately $800.00 twice a month in fees related to the STRS and 403(b) Program. By this Motion, the Debtor seeks authority, but not direction, to honor its obligations under the STRS Program and 403(b) Program and to continue the STRS Program and 403(b) Program in the ordinary course of their business. On the date hereof, the Debtor estimate that approximately $800.00 is outstanding and relates to the prepetition period.

**Workers' Compensation**. Under the law of California, the Debtor is required to maintain workers' compensation insurance to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtor. The Debtor maintains a workers' compensation benefits program through Travelers Insurance (the **"Workers Comp Program"**). The Workers Comp Program provides benefits to all Employees of the Debtor (*i.e.*, for claims arising from or related to the Employee's employment with the Debtor (together with any premiums, surcharges, deductibles and other charges (discussed below), the **"Insurance Obligations"**)). The Debtor pays approximately $5,000-$7,000 per month for the Workers Comp Program, and such amount fluctuates with the amount of payroll. The Debtor believes that it owes its last premium on

17

DOCS_SF:92319.2 84977/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

account of prepetition period and seeks authority to pay such amount in the ordinary course of business.

I believe that the Debtor's failure to satisfy outstanding Employee Obligations would create concern and discontent among their Employees, and adversely affect employee morale. Moreover, it would undermine the Debtor's ability to retain its Employees and educate its students, which is the primary function of the Debtor. If the Debtor cannot promptly assure its Employees that, among other things, accrued PTO will be honored, immediate and irreparable harm may result due to the Employees relocating or resigning prior to the consummation of a successful reorganization. The Debtor's ability to honor payroll, expense reimbursements, insurance, retirement benefits, workers' compensation benefits and accrued PTO is important to maintaining continuity and order to the Debtor's business activity through retention of their Employees. At this critical state of this case, the Debtor cannot risk a significant disruption in their operations caused by low employee morale.

The Debtor has sufficient operating cash to satisfy the foregoing Employee Obligations as they come due in the ordinary course of business. Moreover, the accrued PTO and other prepetition wages for all Employees will be honored up to the $12,850 per employee limit set by section 507(a)(4) of the Bankruptcy Code. The cost of the prepetition medical insurance, workers' compensation premiums, and other employee contributions is not expected to exceed the amount limitation per employee pursuant to section 507(a)(5) of the Bankruptcy Code. In addition, I believe that the relevant time periods for which payment is requested fall within the 180 days prior to the Petition Date as required by sections 507(a)(4) and (a)(5) of the Bankruptcy Code. As these Employees are necessary to maintain the value of the Debtor as a going concern, I believe that such a request is modest in light of the benefit to the estate.

**E.** **School Program Motion**

As of the Petition Date, the Debtor maintains certain programs that consist of the: (i) Instructional Material Program; (ii) the School Lunch Program; (iii) the After School Program; (iv) Advancement Via Individual Determination Program, and (v) certain vendors that supply goods or services that are integral to the administration of such programs (together, the "**School Programs**").

18

Case: 16-43112    Doc# 2    Filed: 11/08/16    Entered: 11/08/16 17:31:13    Page 18 of 24

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

I believe the Debtor must promptly assure students, parents, and other care providers of students of its continued ability to satisfy prepetition and postpetition obligations under the School Programs so that the Debtor is able to maintain the schools, which the Debtor believes is supported by public policy of education and community growth, goodwill with existing students and families and the surrounding community, and many other important benefits derived therefrom, following the commencement of this chapter 11 case.

Any inability of the Debtor to maintain the School Programs would impair goodwill and the Debtor's efforts to educate students, and may lead to the loss of student enrollment. Continued use of the School Programs will enable the Debtor to preserve its educational platform and also help ensure that its relationships with publishers, student base, and others are preserved. Consequently, the Debtor seeks the authority to maintain and administer the School Programs in the ordinary course of business.

### (1)    Instructional Material Program

In connection with the education of students at the Debtor's Charter Schools, each Charter School purchases and/or licenses a variety of instructional materials from multiple vendors and publishers (the "**Instructional Material Program**").

Under the Instructional Material Program, the Debtor provides students at each of its Charter Schools with sufficient textbooks and other instructional materials in the core curriculum areas (*e.g.* reading/language arts, mathematics, science, and history/social science; and foreign language). Through this program, the Debtor provides each pupil with textbooks or instructional materials, or both, to use in class and to take home to complete required homework assignments. Such instructional materials provided under this program include textbooks, electronic access to educational materials, workbooks, science lab equipment, and a variety of educational supplies and equipment. Importantly, the Debtor has instituted the Instructional Material Program to comply with the settlement of *Williams v. State of California*, which requires California schools to provide equal access to sufficient instructional materials and textbooks for all students.

The Debtor, through each of its Charter Schools, purchases and/or licenses instructional materials and text books from certain vendors and publishers. As of the Petition Date, the Debtor

DOCS_SF:92339.2 84993/001

estimates that it owes instructional material publishers and vendors approximately $320,000, on account of prepetition obligations relating to the Instructional Material Program.

The Debtor seeks the authority to continue to honor the Instructional Material Program in the ordinary course of business during the pendency of this chapter 11 case, whether instituted before or after the Petition Date, consistent with past practices, and to pay $25,000 towards any outstanding prepetition obligations to the vendors and publishers relating to the Instructional Material Program and then continue making $25,000 payments each month until the Debtor emerges from chapter 11 or reaches another arrangement with the subject creditors.

(2)     School Lunch Program

In connection with the education of students at the Debtor's Charter Schools, each Charter School has a school lunch program whereby students are provided opportunity to receive nutritious lunches during school hours (the "**School Lunch Program**").

Pursuant to its School Lunch Program, the Debtor provides students at each of its Charter Schools a variety of healthy lunch options through vendors named Choice Lunch and Revolution Foods. Access to the School Lunch Program is an integral part of the students' experience and education at the Charter Schools. Both parents and students rely on access to the School Lunch Program.

The Debtor is required to pay Choice Lunch and Revolution Foods monthly to maintain the School Lunch Program. As of the Petition Date, Debtor estimates that it owes approximately $19,600 to Choice Lunch and $200,000.00 to Revolution Foods, on account of prepetition obligations relating to the School Lunch Program.

The Debtor seeks the authority to (a) pay Choice Lunch its outstanding prepetition claim in the approximate amount of $19,600, (b) pay Revolution Foods $52,000 to reduce its prepetition claim and also make $25,000 monthly payments going forward until the Debtor emerges from chapter 11 or a different payment arrangement is made, and (c) continue to honor the School Lunch Program in the ordinary course of business during the pendency of this chapter 11 case, whether instituted before or after the Petition Date, consistent with past practices, and to pay any outstanding prepetition obligations relating to the School Lunch Program as set forth above.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:92319.2 84977/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(3)     After School Program

In connection with the education of students at Debtor's Charter Schools, the Debtor maintains an educational and support program for students after school (the "**After School Program**").

Through its After School Program, the Debtor provides students with academic support in the form of structured homework assistance and multi-disciplinary activities, including visual arts, arts and crafts, science exploration, and physical activity among others.  Other important After School Program components include daily nutritious snacks, rest and relaxation and organized play.  The After School Program is crucial to the Debtor's operations and its students' education as it provides students with individualized support that is beneficial to the students' learning and development.

Maintenance of the After School Program requires the Debtor to incur a number of expenses, including teacher and staff wages and costs for academic support materials and snacks.

The Debtor seeks the authority to continue to honor the After School Program in the ordinary course of business during the pendency of this chapter 11 case, whether instituted before or after the Petition Date, consistent with past practices, and to pay any outstanding prepetition obligations relating to the After School Program, which includes a prepetition payment in the approximate amount of $1,700.

(4)     Advancement Via Individual Determination Program

In connection with the education of students at Debtor's Charter Schools, the Debtor maintains an Advancement Via Individual Determination ("**AVID**") educational program (the "**AVID Program**").

AVID is a high school and college readiness program designed to help students develop the skills they need to be successful in their education.  The program places special emphasis on growing writing, critical thinking, teamwork, organization and reading skills.  The AVID Program provides the Debtor's teachers and tutors with training on how to prepare students for success in high school and college, particularly for students who are typically underrepresented in higher education.  AVID is widely recognized by policymakers and educators as an essential strategy for student success and making college available for all students.  Accordingly, maintenance of the

21

DOCS_SF:92319.2 84997/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  AVID Program is critical for the current education of the Debtors' students as well as their future

2  success.

3      Maintenance of the AVID Program costs Debtor approximately $3,000 per month.  As of the

4  Petition Date, Debtor estimates that it owes AVID Center approximately $11,328.00, on account of

5  prepetition obligations relating to the AVID Program. The Debtor seeks the authority to continue to

6  honor the AVID Program in the ordinary course of business during the pendency of this chapter 11

7  case, whether instituted before or after the Petition Date, consistent with past practices, and to pay

8  any outstanding prepetition obligations relating to the AVID Program.

9              (5)    Critical Vendors Integral to School Programs

10      To operate its School Programs, the Debtor requires a wide variety of goods and services,

11  including instructional supplies, toiletries and supplies for restrooms, paper goods, among other

12  goods and services ("**Products and Services**").  The Products and Services are typically delivered to

13  the Charter Schools one (1) to six (6) times per week.  If the delivery of Products and Services is

14  stopped or delayed for even one day, the Debtor could not operate its School Programs or its charter

15  schools.

16      Without a full and complete delivery of Products and Services, the Debtor would be

17  extremely disadvantaged in a highly competitive education market and would suffer swift attrition in

18  student enrollment, which would be difficult, if not impossible, to restore.  The Debtor's business

19  depends on, among other things, the Debtor's ability to retain its vendors and maintain its reputation

20  in each respective charter school community as well as student/parent loyalty.  The Debtor needs to

21  be able to assure students and parents that it can continue to provide the services under the School

22  Programs by maintaining the relationships with its vendors that provide Products and Services that

23  are integral to the School Programs, which will enable the Debtor to operate at the highest level.

24      To identify the subject vendors, the Debtor has reviewed its accounts payable and prepetition

25  vendor lists to identify those creditors most essential to the Debtor's operations pursuant to the

26  following criteria: (i) whether certain specifications or other requirements of the Debtor's students

27  and parents prevent the Debtor from obtaining a vendor's products or services from alternative

28  sources within a reasonable timeframe; (ii) whether, if a vendor is not a single-source supplier, the

DOCS_SF:92319.2 84997/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtor has sufficient product in inventory to continue its operations while a replacement vendor is put in place; and (iii) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship products or provide services to the Debtor postpetition if its prepetition balances are not paid.

The Debtor estimates that the payments relating to the vendors that supplied Products and Services equal approximately $81,000. The Debtor seeks the authority to pay up to $81,000 consistent with past practices, and to pay any outstanding prepetition obligations relating to the subject vendors that supply Products and Services that are integral to the School Programs.

**F.     Lease Rejection Motion**

The Debtor seeks the entry of an order (a) approving the rejection of an unexpired non-residential real property lease (together with any amendments and modifications, the "**Lease**") by and between the Debtor, as lessee, and Darim Vision, Inc., as lessor ("**Lessor**") for the premises located at 3110 Constitution Drive, Livermore, CA 94551 (the "**Premises**") effective as of the Petition Date pursuant to section 365 of the Bankruptcy Code, (b) establishing, pursuant to Bankruptcy Rule 3002(c)(4), the later of (i) 30 days after entry of an order granting the motion or (ii) the deadline set by the Court for a prepetition claim to be filed, as the claims bar date for claims arising from rejection of the Lease, and (c) authorizing the abandonment of personal property of the Debtor's estate, if any, remaining at the Premises pursuant to section 554 of the Bankruptcy Code.

The Debtor has vacated the Premises and no longer needs them for its continued operations. I believe that rejection of the Lease will benefit the Debtor's estate because it will save the estate from administrative obligations under a Lease for which the Debtor no longer has any use. In addition, the Debtor has removed any property deemed to be valuable or necessary to the Debtor's operations. I believe that any property remaining at the Premises will be burdensome, or of inconsequential value to, the Debtor's estate and accordingly should be abandoned.

Case: 16-43112    Doc# 2    Filed: 11/08/16    Entered: 11/08/16 17:31:13    Page 23 of 24
DOCS_SF:92319.2 84977/001

1      I declare under penalty of perjury that the foregoing is true and correct and that this

2  declaration was executed this 8th day of November, 2016 at Livermore, California.

3  

4  Lynn Lysko, Ed. D.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA